M-08-471

GDA:JB:NMA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

JOSEPH CALCATERRA,

    Defendant.

- - - - - - - - - - - - - - - X

**Submitted Under Seal**

AFFIDAVIT IN SUPPORT
OF AN ARREST WARRANT

(18 U.S.C. § 892(a))

  MICHAEL T. BRESLIN, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

  Upon information and belief, in or about and between September 2004 and May 2005, within the Eastern District of New York, the defendant JOSEPH CALCATERRA did knowingly and intentionally conspire to make an extortionate extension of credit to John Doe, an individual whose identity is known to the deponent.

  (Title 18, United States Code, Section 892(a))

  The source of my information and the grounds for my belief are the following:

### Background

  1. I have been a Special Agent with the FBI for approximately eleven years and ten months and I am currently assigned to squad C-10, which investigates the illegal activities

of the Bonanno organized crime family of the La Cosa Nostra ("Bonanno family"). As an FBI agent, I have participated in numerous investigations, including investigations related to loansharking, during the course of which I have conducted physical surveillance and participated in debriefings of confidential sources and cooperating witnesses relating to the illegal activities of the Bonanno family.

2. I am familiar with the facts and circumstances of this matter from: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement officials; and (c) information obtained from a cooperating witness.

3. Except as explicitly set forth below, I have not distinguished herein between facts of which I have personal knowledge and facts as to which I have hearsay knowledge.

4. Because this affidavit is being submitted for the limited purpose of seeking an arrest warrant and authorization to arrest the defendant JOSEPH CALCATERRA, I have not set forth each and every fact determined during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause for the requested arrest and search warrants.

## INVESTIGATION

5.  I am currently involved in an investigation of loansharking, among other crimes. I have spoken to a witness ("John Doe")[1] who was a loansharking victim of the defendant JOSEPH CALCATERRA, an associate of the Bonanno family. Between September 2004 and January 2005, John Doe made regular sports-betting and loansharking payments to Vincenzo Masi and Anthony Aiello.[2] These payments were made at various locations in Queens, New York. When John Doe could no longer continue to make payments to Masi, Masi procured a loan for John Doe from the defendant JOSEPH CALCATERRA.

6.  John Doe has advised that between September 2004 and January 2005, John Doe borrowed a total of approximately $16,000 at 6.25% interest per week, or over 300% interest per year, from JOSEPH CALCATERRA through Masi. This figure represents the approximate rate of interest due on the total

---

[1] John Doe has provided law enforcement with information corroborated by additional sources of information, including phone records, surveillance, consensual recordings and payments by an undercover agent to the defendant JOSEPH CALCATERRA.

[2] A cooperating witness ("CW") has advised that Vincenzo Masi is an associate of the Bonanno family and Anthony Aiello is a soldier in the Bonanno family. CW's information is corroborated by, among other things, consensual recordings of Bonanno family members, other cooperating witnesses, visual surveillance, electronic surveillance, analysis of phone records, and other evidence. CW, an inducted member of the Bonanno family, pled guilty to a cooperating agreement charging racketeering with predicate acts of murder, among other crimes.

amount of borrowed money. John Doe borrowed $10,000 at 5% interest per week and $6,000 at 8% interest per week. The repayment of the extension of credit provided by the defendant JOSEPH CALCATERRA would be unenforceable, through civil judicial processes against John Doe in the Eastern District of New York, the jurisdiction within which John Doe resided. In addition, at the time that the extension of credit was made to John Doe by the defendant JOSEPH CALCATERRA and Masi, John Doe reasonably believed that nonrepayment of the loan would be punished through extortionate means. # Shortly after John Doe was unable to continue to make loan payments to the defendant JOSEPH CALCATERRA and other individuals to whom he owed money, John Doe fled from the area.

6. On February 8, 2005, John Doe made a consensually recorded call to Masi, in which Masi stated that he needed the $16,000 to pay back his friend, a reference to the defendant JOSEPH CALCATERRA. In the course of this recorded call, Masi told John Doe that if he could not pay back the $16,000 loan, he at least needed to pay the "juice money." Based on my training and experience, the term "juice money" is used by those engaged in loansharking to refer to interest payments. During the course of this recorded conversation, John Doe also proposed a meeting with Masi in order to try resolve John Doe's debts. At the conclusion of this call, John Doe and Masi agreed to speak again

# At that time John Doe was aware that Masi had connections to organized crime. KAB

4

in the future.

7. On February 11, 2005, John Doe participated in a consensually recorded call with Masi. During this conversation John Doe proposed to Masi that John Doe, John Doe's cousin (an FBI agent working in an undercover capacity) and Masi meet to discuss John Doe's debts. John Doe also stated during this conversation that John Doe could bring approximately $3,000 to pay toward his outstanding debts. John Doe also asked Masi about "gambling money" and "T's money," to which Masi replied not to worry about the gambling money. It is my understanding that "gambling money" is a reference to money lost by John Doe in sports betting and that "T's money" is a reference to loanshark money owed to Bonanno soldier Anthony "T" Aiello.

8. Also during the February 11, 2005, conversation Masi stated that John Doe had to take care of both "my friend's money" and "T's money." Masi and John Doe discussed whether "the points" on Masi's friend's money could be "dropped down." When Masi asked John Doe whether he could resolve the entire $16,000 debt at one time, John Doe replied that he could not do so but that $3,000 would help to catch up on "juice payments." Masi's reference to "my friend's money" was a reference to the $16,000 loanshark loan provided by defendant JOSEPH CALCATERRA. The discussion of "points" is a reference to interest percentage points charged on a loanshark loan, and John Doe's request to

5

drop the points is a proposal to negotiate lower interest payments on the $16,000 loan. The February 11, 2005 call concluded with Masi telling John Doe that John Doe will likely have to meet Masi's friend, a reference to the defendant JOSEPH CALCATERRA, to whom John Doe owes the $16,000, and that "maybe he won't even charge you the juice anymore."

9. On February 17, 2005, John Doe participated in another consensually recorded phone call with Masi. During this call John Doe and Masi agreed to meet in the evening of February 18, 2005. During this call John Doe asked Masi whether Masi will be bringing anyone with him, to which Masi replied that "I'm gunna have to bring that kid down to talk," referring to the person to whom John Doe owed the $16,000, the defendant JOSEPH CALCATERRA.

10. On February 18, 2005, John Doe participated in another consensually recorded phone call with Masi. During the course of this conversation, Masi and John Doe agreed to meet at approximately 8:00 pm at a diner located at 9th Avenue and 23rd Street in New York, New York. John Doe again asked Masi about the person Masi would be bringing and Masi replied that he would be bringing the individual to whom John Doe owed the money, a reference to the defendant JOSEPH CALCATERRA.

11. A review of phone records has revealed that on February 18, 2005, there were four telephone calls between a

cellular phone used by Masi, 347-255-1071, and a cellular phone subscribed to by the defendant JOSEPH CALCATERRA, 917-846-6075. These calls occurred at 8:33 a.m., 6:57 p.m., 7:23 p.m., and 7:36 p.m.

12. On February 18, 2005, John Doe was accompanied by an undercover FBI agent, posing as a relative of John Doe, to a meeting at the Chelsea Square Restaurant, 368 West 23rd Street, New York, New York. This meeting was surveilled by FBI agents and recorded by the undercover FBI agent. At approximately 8:03 p.m., a 2003 grey Infiniti, bearing New York plate CDZ5270 was observed passing the restaurant on two occasions. A check with the New York State Department of Motor Vehicles revealed that this vehicle was registered to the defendant JOSEPH CALCATERRA, 61-09 60 Avenue, Maspeth, New York.

13. At approximately 8:20 pm, Masi and an individual subsequently identified as the defendant JOSEPH CALCATERRA entered the restaurant and met with Masi and the undercover agent. This meeting lasted approximately 30 minutes. A review of the recording indicates that the defendant JOSEPH CALCATERRA introduced himself as "Joe" at the beginning of the meeting. During the course of this meeting, Masi again told John Doe not to worry about John Doe's gambling losses. At one point John Doe asked what would happen next and the defendant JOSEPH CALCATERRA responded by telling John Doe that he had to work something out

with him, stating, "I was told that you needed some money and I was going to get it back in three weeks with a little interest..."

14. Later in the meeting, the defendant JOSEPH CALCATERRA told John Doe that he will accept $9,000 more to resolve the debt and stated, "That's no juice, no nothing...I just want my money back." The defendant JOSEPH CALCATERRA later told John Doe that he was "nine in the hole with me" and that "nine makes it go away." The undercover agent and the defendant JOSEPH CALCATERRA then agreed to resolve this debt in three payments of $3,000 each. In reference to this $9,000, the defendant JOSEPH CALCATERRA's stated, "That's no juice, no tax, no nothing." At the conclusion of this meeting the undercover agent handed $3,000 to the defendant JOSEPH CALCATERRA, which the defendant JOSEPH CALCATERRA accepted. The defendant JOSEPH CALCATERRA and Masi were then observed departing the restaurant and leaving in the defendant JOSEPH CALCATERRA's vehicle.

### Sealing

15. Based on the confidential nature of the investigation described herein and the potential danger posed to the witness whose information is contained herein, I respectfully


ask that this affidavit be filed under seal until further order of the Court.

WHEREFORE, I respectfully request that the Court issue an arrest warrant for the defendant JOSEPH CALCATERRA so that he may be dealt with according to law.

_____
MICHAEL T. BRESLIN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of May 2008

UNIT                    JUDGE
EAST                    YORK